## Hancock *v.* Holbrook and others.

*(Circuit Court, E. D. Louisiana. June, 1881.)*

1. **CORPORATIONS—CHARTER—CONTROLLING EFFECT.**

     The charter of a corporation empowered the board of directors to appoint the corporate officers. *Held,* that mere verbal understandings between individual members of the board prior to the incorporation of the company as to the choice of such officers, would be controlled by this provision.

2. **DISSOLUTION OF THE CORPORATION—WHEN JUSTIFIABLE.**

     The conveyance, under the authority of the board of directors whose action is ratified subsequently by all the stock represented at a meeting of the stockholders, of the total assets of a private corporation in payment of its sole debt, operates as a valid conveyance of the property as against other stockholders, in the absence of fraud and when a longer continuance of the corporate business would be ruinous to all parties.

*H. C. Dibble,* for complainant.

*T. J. Semmes* and *R. Mott,* for respondents.

BILLINGS, D. J. This case is submitted for a final decree upon bill, answer, depositions, and exhibits. The suit included Charles T. Howard as one of the defendants, whose claim upon the property hereafter described was admitted by all parties in this suit, and has since been satisfied. His rights, therefore, are not submitted for

adjudication. Of the other defendants, Mr. and Mrs. George Nicholson, (who claim title under A. M. Holbrook,) is demanded twenty of fifty-one equal parts in the establishment known as the "Picayune Newspaper & Printing Establishment," with an accounting and decree for profits. The facts, which are either admitted in the voluminous pleadings or established by the evidence, are as follows:

On the nineteenth day of December, 1873, there existed in the city of New Orleans a corporation known as the Herald Printing Company, which, at that date, bought at sheriff's sale, on a 12-months' bond, for the price of $20,100, the New Orleans Picayune Newspaper and Printing Establishment, giving as a surety upon the bond Joseph Hernandez. Ex-Gov. H. C. Warmoth induced Mr. Hernandez to go upon the bond, agreed to hold him harmless for so doing, and seems to have been the party really furnishing the security. The Herald Printing Company was a corporation in which the complainant and Alexander Walker were largely interested, and it published a newspaper called the New Orleans *Herald*, of which these last-named gentlemen were editors and managers.

Chiefly through Gov. Warmoth's influence an agreement was formed and carried out, in accordance with which the Herald Company conveyed the *Picayune* establishment, recently purchased, to A. M. Holbrook, who agreed to pay the twenty thousand dollar twelve-months' bond, and a new corporation was formed, under the general law authorizing the same, called the "New Orleans Picayune Printing Company, to print and publish a newspaper or newspapers, and carry on a printing and publishing business of every kind." To this corporation A. M. Holbrook was to convey, and did convey, the *Picayune* establishment, derived from the Herald Company, which constituted its capital, fixed by its charter at $30,000, and divided into 120 shares, at the par value of $250 each. Of these shares A. M. Holbrook was to receive, and did receive, 65 shares, the complainant 15 shares, and Alexander Walker 10 shares. The complainant and Walker, along with all the other stockholders, received shares in the *Picayune* establishment in the same proportion as they had held shares in the *Herald* undertaking. The *Herald* was no longer published, and became merged in the *Picayune*, which last was to be conducted under the new charter. That charter provided that "the corporation shall be governed by a board of directors of five persons."

The first board of directors was declared to consist of A. M. Holbrook, Peter St. Armand, R. W. Holbrook, Alexander Walker, and E. C. Hancock, (the complainant.) The board of directors had, by the charter, power given them "to adopt such by-laws as may be necessary to manage the company and appoint such officers and clerks as may be required." It seems to have been distinctly understood, not only that A. M. Holbrook should thus have a majority of the stock, but that of the five directors, who were to serve for at least one year, and who were named in the charter, two should in some sense be representatives of him—namely, Mr. Armand and R. W. Holbrook (his brother) —to each of whom was transferred one of A. M. Holbrook's shares. The corporation went into operation, then, with three directors, who held shares

as follows: A. M. Holbrook, 63 shares; Peter St. Armand, 1 share; R. W. Holbrook, 1 share; E. C. Hancock, 15 shares; and A. W. Walker, 10 shares.

The persons who held the remaining shares were named in the charter, though all the certificates do not seem by the stock-book to have been issued. The complainant subsequently derived title to two shares by purchase,—one from D. P. Penn, and one from the estate of William P. Harper,—and three were donated to him by holders who were personal friends. The charter bears date December 19, 1873. There seems to have been an understanding on the part of the complainant and Judge Walker, which is corroborated by Warmoth, that Walker was to be chief editor and complainant the managing editor, and A. M. Holbrook the business manager. But, unfortunately, this understanding was merely verbal, and was not recognized by the terms of the charter, which placed all these matters under the control of the directors; and, on December 26, 1873, a set of by-laws was enacted, all of the directors being present, and all voting in favor of their adoption except the complainant, which clothed the president (A. M. Holbrook) with authority to " organize the various departments of the paper, and employ and discharge all editors and employes, and fix their salaries, and to have the general supervision of all the operations and transactions of the corporation." This action of the directory disclosed how wide was the misunderstanding between complainant and Walker on the one part, and A. M. Holbrook, who was sustained by the charter, on the other part.

On the sixteenth day of December, 1874, the 12-months' bond for $20,100 was to mature. Shortly before this time A. M. Holbrook announced to all concerned his inability to pay the bond, and his determination that the property purchased with the bond should be used in the payment of the bond. Through Warmoth offers were made from Holbrook to Mr. Walker that if he or any of his friends would pay the bond, they should have the *Picayune*. This Mr. Walker was unable to do. Mr. Aroni, as the counsel of some one, at one time offered to make the payment and take the property, but subsequently withdrew the offer.

On December 14, 1874, the majority of the board of directors, the complainant not being present, and Mr. Walker voting nay and protesting, passed a resolution to the effect that if Mr. Hernandez would pay the bond he should have conveyed to him the *Picayune* establishment. On the following day Warmoth, through Hernandez, paid the bond and received the conveyance. The amount paid was $20,211.

On the twenty-second of December, 1874, a special meeting of the stockholders, called by the directory, passed resolutions ratifying the action of the directors in making the conveyance to Hernandez in payment and settlement of the 12-months' bond, and dissolving the corporation. Shortly after such dissolution, Hernandez, acting for Warmoth, sold and conveyed the entire Picayune establishment to A. M. Holbrook for his promissory notes, amounting to $27,500, falling due in monthly instalments, the last not maturing for several years, and bearing interest at the rate of 6 per cent. per annum.

Two promissory notes had been given by A. M. Holbrook to Warmoth for debts due from the Herald Company to him, and for his services in connection with the paper. These notes were given at the time of the formation of

the *Picayune* corporation, in or about December, 1873, and had no connection with the transfer to Holbrook; and though it is evident they were paid with more readiness by him after the action of Warmoth in making such transfer, or rather that resistance to their collection was withdrawn, they existed long before as the obligations of Holbrook, and have no bearing upon the case, and may therefore be dismissed from further consideration.

The first question to be considered is whether the conveyance of the *Picayune* establishment, executed under the authority of the board of directors and ratified by a meeting of the stockholders, was valid, and could and did, in law, convey title to Hernandez. It is not necessary, in the view I have taken of this case as exhibited in the record, to do more upon this point than to see that the meeting of the stockholders was lawfully convened and regularly constituted; for since this meeting ratified the sale and transfer, and since the members or shareholders are the real principals or constituents of the corporation, if what they did was within the scope of their capacity, and was regularly done in time and manner, it would be conclusively the action of the corporate body. The Herald Company had given a 12-months' bond, in amount upwards of $20,000, for this very property, and then the same corporators, with the same proportionate interests, had added a new corporator, A. M. Holbrook, and changed the name of the corporation, using the purchased property as a capital. As between the bondholder and the new corporation, to the extent of the purchased property, the bond was surely enforceable against that corporation. The collateral undertaking of Holbrook to pay the bond did not at all affect these relations. The debt was the debt of the New Orleans Printing Company. Indeed, the bill of complaint of the complainant concedes this. At paragraph 23 he says:

"For this petitioner avers and admits that in equity and good conscience, and notwithstanding the fraudulent and illegal combinations and transactions of said A. M. Holbrook, Joseph Hernandez, George Nicholson, Peter St. Armand, and R. W. Holbrook, nevertheless the said New Orleans Picayune Printing Company, and the holders and owners of the remaining 51 shares of stock thereof, owed to the said Joseph Hernandez, or his legal assigns, the amount in money which the said Joseph Hernandez paid for the discharge of the 12-months' bond aforesaid, upon which said Hernandez was surety aforesaid, but *which was primarily the debt in equity and good conscience of the New Orleans Picayune Printing Company, as successor of the Herald Company,* which corporation was legally the principal on said bond."

The thing done, then, was for a corporation, at a meeting of stockholders, to sanction and ratify the application of its property to the payment of its sole debt.

It has been urged by the complainant that the board of directors was constituted so that of five A. M. Holbrook controlled three. But it cannot be denied that a board of directors, who are specially designated by name in the charter of the corporation, have authority to call a meeting of stockholders. A board of directors thus designated convened the stockholders who acted upon this subject. At this meeting 91 shares were present and voted for the ratification. The stock-book of the company shows that the persons so present and voting were the representatives of genuinely-issued stock. So far as relates to the question of the competency of the stockholders to make the ratification, it is immaterial to inquire how much of this stock A. M. Holbrook owned, provided he actually owned it. This question may be material in another aspect of the case, which I shall consider further on, namely: What consequences in equity and law would follow after he acquired the property? But there was nothing in the fact that he owned the majority or the entirety of the stock present and voting, provided he had acquired it in the prescribed manner, and actually owned it, which would detract from the force of the vote.

If it were necessary to decide whether, and it should be decided, that, upon Holbrook's default in the payment of the bond, the 65 shares of the stock first received by him had in equity reverted to the corporation, and therefore should be treated as not voting, the case would stand thus. There were originally 120 shares, only 109 of which had been issued. McComb had surrendered his four shares to the corporation; so that counting all as issued, which I think should be done, we have, besides the 65 shares, 26 other shares present and voting aye. There being but 116 shares, there could have been only 25 outstanding shares, issued and unissued, which did not assent to this transfer, and the 26 shares assenting constituted a majority of the stock, even after excluding the 65 shares.

What are the powers of stockholders, and of a majority of stockholders, under our statute and at the common law? The Revised Statutes (Voorhies' Ed.) § 687, (Acts of 1852, p. 130, § 5,) provide that "it shall be lawful for the stockholders of any corporation, at a general meeting convened for that purpose, to make any modifications, additions, or changes in their act of incorporation, or to dissolve it, with the assent of three-fourths of the stock represented at such meeting." Here is authority so broad that it cannot be questioned, that it includes much more than the appropriation of all the property of a corporation to pay a debt which it owed; and the vote

was not only three-fourths, but *all* of the stock represented at the meeting.

At the common law the right of the majority of the stock to control the operations and winding up of corporations like this, not of a public character, is undoubted.

In *Pratt* v. *Jewett*, 9 Gray, 34, a majority in number of stockholders, owning a minority of stock, petitioned for a dissolution of a manufacturing company. In their petition they averred, among other things, that "a sole owner of a majority of the stock had for many years controlled the election of officers, and elected himself agent and clerk, and that he had for a long time managed the business according to his own will and choice, regardless of the wishes and interests of the petitioners; that according to his statement the corporation had been doing a losing business for years; and that he refused to make any change in the business, or to purchase the shares of the petitioners." The court answered that no sufficient reason was shown for a dissolution of the corporation; that "Jewett, owning more than two-thirds of the stock, was entitled to the control; that the true misfortune of the petitioners seemed to be that they are in the minority, and cannot control the majority of the stock."

In *Treadwell* v. *Salisbury Manuf'g Co.* 7 Gray, 404, the court say:

"We entertain no doubt of the right of a corporation, established solely for trading and manufacturing purposes, *by a vote of the majority of their stockholders*, to wind up their affairs and close their business, if, in the exercise of a sound discretion, they deem it expedient to do so. At common law the right of corporations, acting by a majority of their stockholders, to sell their property is absolute, and is not limited as to objects, circumstances, or quantity." See, also, authorities there cited.

Although the act of transfer was within the capacity of the members of the corporation, and their sanction to it was in form legal and effective, and Hernandez took title under it, and gave title to A. M. Holbrook, this does not necessarily conclude the complainant, or close the door to relief in his behalf.

There remains the vital question, whether the transfer from the corporation to Hernandez was effected in fraud of the complainant's interests, or whether, by his own conduct with reference to the publication of the *Picayune* newspaper, the transfer was rendered justifiable and expedient. On behalf of the complainant, it is claimed that A. M. Holbrook received 65 shares of the stock in consideration of his agreement to pay at maturity the 12-months' bond; that large

powers were given to him in the board of directors in consideration of the same agreement; that when he suffered default to be made in the payment of the bond, and permitted the publishing establishment to be applied to its satisfaction, he violated a *quasi* trust; and that, upon his purchase of the establishment, he must be treated as holding it in trust for the complainant to the extent of his former proportionate interest. On behalf of the respondent, it is claimed that all of the stock, except that held by the complainant, has for a long time been owned by them; that the reason of the sale to Hernandez was not any wish or purpose to defraud the complainant, or any of the stockholders, but that the cause which necessitated it was the incurable dissentions between Walker, A. M. Holbrook, and the complainant, and a continued refusal on the part of complainant to comply with the charter and by-laws made in pursuance thereof, so far as related to the conduct of the paper; and that in consequence of this dissension on the part of those in interest, and the defection of the complainant, the paper became so crippled financially that it was impossible for A. M. Holbrook to pay the bond at maturity, and the only wise disposition of the paper that could be made in the interest of all the corporators was to apply its entire establishment to the payment of its sole debt.

As furnishing aid in solving this question, it is important to determine whether the sale to Hernandez was made in order to enable a disrupted corporation to dispose justly of its assets in payment of its debt, or whether it was a step in a fraudulent scheme to convey the property through Hernandez to Holbrook. The action of Warmoth would fairly indicate the controlling purpose of the movers, as his liability to indemnify Hernandez for his becoming security on the $20,000 bond must have led him, and his intimate relations with both Holbrook and Hernandez must have enabled him, to know thoroughly the transaction from beginning to end. His action in this matter stands for that of Holbrook. He (Warmoth) testifies on this subject that, after learning of Holbrook's inability to pay the bond, he informed Alexander Walker—who, it must be remembered, stated, in his protest against the conveyance to Hernandez, that he represented the entire non-assenting stock, including all of complainant's—"that if he or any of his friends would pay the bond, they should have the property, namely, the *Picayune* establishment. At one time he said he would pay the bond and take the property, which he never did." This is confirmed by the testimony of Judge Walker.

If Holbrook had proposed to defraud and to acquire title by having

the bond enforced, would he have gone to those whom he is charged with compassing to defraud and offered the coveted title upon payment of the bond? It would be extremely difficult to reconcile this offer with any conspiracy to defraud the complainant or Walker, or with any scheme to secure the property for Holbrook, or with any other purpose save that of judiciously closing up an enterprise which, from incurable discord, had to be abandoned as a failure. Holbrook's purchase of the additional stock is reconcilable with the same purpose, stimulated by a desire, by payment of Hernandez's bond through the assets of the company, to relieve himself from a loss which he felt the fault of others, including complainant, would more justly place upon them than him.

The charter placed the control of the whole business in the hands of the directors, and they, by their by-laws, gave the editorial and business management into the hands of A. M. Holbrook, the president. Though this may have been distasteful to the complainant, since done in accordance with the supreme and organic law of the corporation, it constituted no good ground of his withdrawal of his aid and co-operation from the joint enterprise. There could be no prior understanding between members of a corporation which could prevent the supremacy of its charter as constituting the rule for its operations and the law for its members.

Still, the complainant seems to have been so impressed with the idea that the adoption of the by-laws of December 26, 1873, which gave the supervision over the editors to the president, was a violation of the understanding with which he had entered into the corporation, that he states in his testimony that "he felt from that time that he could not attend any meeting of the board of directors, or assume any connection with the *Picayune*, without condoning a fraud and jeopardizing my own interest and those of other stockholders of the paper. He stood ready to resume his post as managing editor, and never refused to perform any duty in that line." The fact of this position of resistance to the by-laws upon the part of the complainant is stated by nearly all witnesses who testify on the subject.

Alexander Walker says: "Mr. Hancock never attended any meetings of directors but one or two, and he retired from the board and retired from the establishment, and I never saw him or held any consultation with him during the year following." He says, also: "We of the Herald Company had been exceedingly dissatisfied with the assumption of the entire control of the establishment by Mr. Holbrook."

St. Armand, though on the cross-examination he seems to have derived much of his information from Holbrook, expresses the opinion that the paper became a source of loss in its publication, and that it became such in consequence of a want of cordial assistance from the complainant and Walker.

Ex-Gov. Warmoth, who was the friend of the complainant, of A. M. Holbrook, and of Judge Walker, who had the fullest opportunity of knowing of their relations and conduct in connection with the newspaper, as well as of the facts concerning the newspaper itself, says that about the time the 12-months' bond was falling due Holbrook informed him he could not pay it. He further testifies:

"He [Holbrook] and Hancock and Walker, who were, by agreement, to be managers and editors of the *Picayune* newspaper, under the control of Holbrook, had disagreed. Each one wanted to have the whole control of the editorial department. In consequence of this Hancock did not give the aid which was expected, nor the countenance and assistance which was so necessary to the success of the paper. He was an able and influential newspaper man, and his defection was a serious drawback to success, and the enterprise eventuated in a failure."

Upon cross-examination he gives the language which each of those gentlemen used with reference to the other two. It evidenced such total distrust and such bitter personal feeling that successful joint action on their part in any business was beyond reasonable expectation. It would be essential in any business, but absolutely necessary in the business of conducting and publishing a daily newspaper; in which such practical sagacity and untiring vigilance is demanded, in which one day of inaction or ill-advised action in consequence of dissension on the part of managers might entail irreparable pecuniary loss upon proprietors. The testimony of Gov. Warmoth, thus corroborated, establishes the continued dissension on the part of these three leading newspaper men, the withdrawal of the complainant, and the damaging effect of this upon the interests and prospects of the newspaper. The testimony as to the value of the *Picayune* establishment is to be considered with reference to these facts. The witnesses vary in their estimates, ranging from $5,000 to $100,000. But it is clear that unless the internal obstacles could be removed the paper could have had but little value beyond the type and material. A year previous it had been sold for $20,000 on a 12-months' credit. Fourteen months afterwards it was appraised in the succession of A. M. Holbrook at $30,000. At the time of the sale to Hernandez it was offered by Warmoth to those in interest for the amount

of the bond, less than $21,000, and no purchaser could be found. Warmoth testifies that he regarded the long notes of Holbrook for $27,500 as worth scarcely more than 25 per cent. of their face. The estimate of witnesses cannot outweigh these facts, and the question before the court is as to the wisdom of the sale with reference to a corporation situated in its internal relations precisely as this was; that is, rent and paralyzed by serious and unabating animosities and differences on the part of those who were its directors and sources of chief energy.

Under the circumstances, the sale on the part of the stockholders was justifiable and judicious. It would have been utter ruin to have continued the publication of a paper so situated—ruin for all concerned. The language of the supreme court of Massachusetts in *Treadwell* v. *Salisbury Manuf'g Co.* 7 Gray, 405, may with propriety be adopted as decisive of this question. The court say: "Upon the facts found in the case before us, we see no reason to doubt that the vote of the majority of the stockholders for the sale of the corporate property and the closing of the business of the corporation was justified by the condition of their affairs. Without available capital, and without the means of procuring it, the further prosecution of their business would be unprofitable, if not impracticable."

But, it is urged by the solicitor of the complainant, Holbrook was acting as and with the responsibilities of a trustee, and when he repurchased the property he held it in trust for the complainant to the extent of his former proportionate interest in the corporation. Holbrook had undertaken to pay the 12-months' bond, and he failed to perform his undertaking. True, he did fail in carrying out that undertaking, and the property of the corporation was applied to pay a debt which, as between it and Holbrook, belonged to him to pay. But it is established that Holbrook's inability to pay the bond, and the inability of the corporation to prosecute profitably its corporate business, resulted largely from the continued refusal on the part of the complainant to acquiesce in the charter, and from discordant views and action in which complainant largely participated. In consequence of this an enterprise, which the testimony shows might have been advantageous both to complainant and Holbrook, was rendered a failure, and Holbrook, who had received nothing but the 65 shares of stock, allowed that to pass, with that of the other holders, to Hernandez, in payment of a debt which existed prior to his acquisition of the stock. The business of the corporation had become a failure, and the court finds that the defection and withdrawal of the com-

plainant from this business, which he was bound to aid and assist, was, to a large extent, the cause of the failure. Under these circumstances, the complainant cannot urge as a cause of action in a court of equity that Holbrook restored to the corporation all he had received, placed it, so far as possible, in *statu quo,* and did not prevent the application of its property to the extinction of an obligation which had existed before he had any connection with it.

The complainant has failed to establish his cause, and the decree must be that the bill be dismissed.